[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for termination of parental rights instituted by the Department of Children and Families (DCF) and filed on February 5, 1996 at the Superior Court for Juvenile Matters in Waterbury. The case was subsequently transferred to the Child Protection Session of the Superior Court for Juvenile Matters at Middletown for trial. The children are Christopher S., born February 12, 1991, and Joshua S., born January 1, 1992. Their mother, Sharonda S., was born on July 27, 1977. Sharonda herself was CT Page 8962 known to the Department of Children and Families for several years before these children were born, she herself as a child had been beaten with an extension cord by her mother and lived in very unwholesome conditions.
Sharonda indicates that she was raped by her half-brother, Robert S., and that he might be Christopher's father. She also indicated to the social worker that she was involved with one Deric H. who also might be Christopher's father. Christopher was born when Sharonda was thirteen. Eleven months later she gave birth to Joshua. Both children were prematurely. Sharonda names Robert D. who now lives at an unknown address in Jamaica, as the father of Joshua. All of the fathers were notified of the pendency of these proceedings principally through constructive notice since their addresses could not be ascertained after diligent efforts. None of the fathers has ever taken an active roll in the lives of these two children.
Being premature infants, both had extensive hospitalization following their births. Christopher weighed three pounds and one ounce and was in the hospital for two months at Yale New Haven before being transferred to Waterbury Hospital. He was discharged at age three and a half months to the care of his mother. Christopher has, according to his social study, been consistently developmentally delayed in all areas. Joshua was born at St. Mary's Hospital in Waterbury and weighed three pounds six ounces. He spent one month at St. Mary's Hospital and one month at Yale New Haven Hospital. He is reported to be consistently, globally delayed, he suffers from severe and chronic respiratory problems and macrocephaly. Sharonda returned to live with her mother, Mrs. Annie S., the children's maternal grandmother, after the birth of her children. It is unclear whether her mother was the principal caretaker of the children or whether Sharonda was the principal caretaker of the children, if indeed, anyone was the principal caretaker.
On September 20, 1991, when Christopher was seven months old, Department social worker Nancy Wilcox visited Sharonda's mother to discuss an allegation of physical abuse inflicted upon Sharonda by her mother. Mrs. Annie S. admitted to hitting her daughters with an electrical cord and stated that she becomes frustrated because so many of her children are home and they keep having babies. In August 1991, Mrs Annie S. had called the Department of Children and Families to notify them that Sharonda was pregnant again, perhaps by a thirty-year-old man, and CT Page 8963 reported also that one of her other daughters was pregnant.
A year later on October 5, 1992, a report of suspected child abuse was filed (State's Exhibit 9). In this report, Sharonda came to school wearing a red handkerchief which covered her head. She indicated that she had been beaten by her mother with an extension cord and had a one to one-and-a-half inch laceration which was bloodied and swollen. The report further indicates that Sharonda has two sons ages, one-and-a-half and eight months, and that she also states that she is again pregnant.
On September 17, 1992, the Visiting Nurses Association reported that the home in which the children were residing was not good. Various small children in the home were sick, dirty and medically neglected. Sharonda had to be told to change Joshua. There was old bath water standing in the tub.
The following excerpts from the social worker's affidavit indicates the conditions which these children were raised. On August 11, 1993, Siobhan Trockman, a Social Worker for the Agency, and April Crosby made a home visit to the home of Mrs. Annie S. There were seven children and four adults in the home. The back bedrooms were dirty with clothing and various items thrown about. A dirty diaper was thrown on the floor, no sheets were on the beds and the garbage needed to be taken out. Four small children were in a room playing alone unsupervised. They were observed to be playing with a lamp, curtain rods and hangers, which the workers took away from them. Joshua was found sleeping in a room in a bed with no sheets, he was near a window with no screens on it, flies were observed to land on his bottle. All of the children including Christopher were clothed only in diapers and had dried mucous on their faces. The door to the street was open and there was no screen door to keep the children from going in the street. Open bags of garbage were in the apartment.
The worker noted further that Christopher and Joshua continued to be in need of services from Easter Seals and other service providers due to their developmental delays. Sharonda, the grandmother nor any other member of the family has been cooperative in obtaining these services. The numerous small children in the household, Christopher and Joshua, remained poorly supervised and were living under conditions and circumstances which were potentially injurious to their well-being. CT Page 8964
On another occasion Joshua and Christopher were seen in the home naked and extremely dirty. Christopher had a yellowish-green mucous coming from his nose and his face. Sharonda S. made no effort to wipe the child's nose. The windows were low to the floor and easily accessible to the children, and were left open throughout the home.
On August 30, Siobhan Trockman visited the home. Sharonda was present in the home with Christopher and Joshua. "The home was in an absolutely deplorable state, drawers were pulled out onto the floor, clothes were thrown throughout the home, the home reeked of garbage and urine, old plates of food were sitting on the kitchen table, the home was swarming with flies, Christopher and Joshua wore only a pamper." Both children were dirty and their pampers were soiled to the point where urine and feces could be seen through the pampers.
Sharonda had consistently refused to take the children to the Pediatric Ambulatory (PAC) for required medical treatment and follow-up. She stated that she did not feel that Christopher needed to go for a follow-up visit and she was not going to take him. Neither did she regularly take him to the Easter Seals Center. After Joshua's birth, both of the children had been enrolled at Easter Seals Rehabilitation Center by the pediatrician; however, after four months the case was closed by Easter Seals Rehabilitation Center because of poor compliance and consistent absences from the program. In June 1992, the Center indicated that Christopher had missed seven scheduled appointments out of twelve. When the van had arrived to pick them up, they were not ready or refused to go. On several occasions the adults were rude to the driver.
During January 1992, the maternal grandmother, Annie, reported Sharonda had stayed out of the home for two or three weeks at a time. On January 27, 1993, social workers visited the home. In addition to the maternal grandmother, Annie, and her two teenage daughters, Sharonda and Loreen, as well as a seventeen-year-old niece living in the home, the workers also found seven children all under the age of four.
DCF was aware that Sharonda needed guidance in caring for Christopher's and Joshua's developmental, hygienic, nutritional and emotional needs. DCF had referred Sharonda to the pre-school intervention program for Christopher but mother refused the CT Page 8965 services. The Easter Seals Center had requested that the maternal grandmother, Annie, attend Christopher's therapy sessions as well, but again there was no follow-up on this. Annie reported to DCF on July 29, 1992, that Sharonda had been arrested for fighting and was on probation. She further indicated that Sharonda was not attending the Easter Seals Program with Christopher and that Sharonda was staying out until all hours of the night.
All during this period prior to the removal of the children from the home, numerous agencies attempted to cooperate and provide services for Sharonda, her mother and the children, including a referral to a program known as the Family Preservation Program. Sharonda, herself, was a month over sixteen when the Department of Children and Families finally moved to take custody of the children on August 13, 1993.
On September 23, 1993, following the issuance of an Order of Temporary Custody putting the children into the custody of the Commissioner, the family, Sharonda and her mother, were referred to a Parent-Aide Program, and a visitation schedule was set up for Sharonda and the children. In October Sharonda was invited to attend an administrative case review but did not do so. In November the court committed the children to the Commissioner of DCF as neglected and uncared for. During the months while the children were out of the home, Sharonda was very irregular and spotty in her visitation, although she was frequently invited to go to her visitation and was offered assistance in visiting with the children. On one occasion she indicated that she did not wish to go because the boys cried when she left. On another occasion in May 1994, Sharonda informed the worker that she cannot take care of herself let alone take care of the children.
At that point she requested her mother have custody of the children. What is clear from the record is that her mother was abusive as a parent, inflicting, among other things, electrical cord injuries onto her children and maintaining a very unwholesome, undisciplined environment for her own family. The Department of Children and Families appropriately did not consider Annie as an appropriate resource for placement. Indeed on May 25, 1994, a special study for licensing Annie S. was declined due to the history of prior involvement with the agency. A computer check indicated that out of the ten referrals made regarding Annie S.'s conduct alleging child abuse and neglect, nine of those referrals had been substantiated. CT Page 8966
The treatment plan for Sharonda of March 28, 1994 indicated that Sharonda is mentally limited and has an active case with the Department of Mental Retardation. At that time Sharonda was leading a transient life living with friends, relatives and boyfriends. Her mother had recently kicked her out of the house because she would take off for days at a time and was whereabouts unknown. Sharonda was reportedly pregnant with her third child and planned to have the father raise the child or give the child to a relative (Petitioner's Exhibit #3).
When Sharonda tried to make an effort to meet the court approved expectations, the results were, at best, mixed. On June 13, 1994, Sharonda expressed some interest in finding her own apartment and getting away from her mother due to their constant fighting. On June 14, Alberta Hinkelman from Family Ties informed DCF that Sharonda had attended six of the SOS classes, four of the Health Seminars and two sessions of Support Group and one Young Parent Class. Mrs. Hinkelman reported, however, that Sharonda slept through most of the classes.
The Social Study submitted as Petitioner's Exhibit 7, indicates that as of February 1996, Sharonda did not have a permanent address, she was staying with different friends, and she admitted to substance abuse within the preceding six months. The record further reflects attempts to contact or work with Sharonda almost weekly over the course of nearly three years. Sharonda has made some very modest attempts but nothing sustained, and the records kept by the Department of Children and Families reflect that Sharonda made only seventeen visits out of two hundred twenty (220) visits which were available to her at various times over the course of the last three years. At one point she advised social worker Sandra Clark that she was "on the streets, involved with drugs, and was unable to bring herself to do visits." She has failed to keep the Department of Children and Families advised of her whereabouts.
In the counseling which has been frequently made available to her, none has been successfully completed. On two occasions a parent aide was assigned to assist Sharonda; on both occasions the case was closed because they were unable to locate her. Sharonda has not been able to secure and maintain adequate housing.
What is extremely sad, but also telling, is the comment that CT Page 8967 Sharonda made on October 23, 1995 at an Administrative Review Hearing. The DCF worker advised her that they were going to begin an action for termination of her parental rights and that the children would be placed for adoption, to which Sharonda replied "could you find a home that would adopt me?" Sadly, Sharonda was a very poorly parented child herself, she has intellectual limitations, she became pregnant and delivered an infant at the age of thirteen, she had a subsequent child at the age of fourteen and multiple pregnancies since then. As she appeared in court, she testified that she is now again pregnant and due to deliver on February 21, 1997.
In addition to a limited number of visits during the past three years, the quality of her visits are extremely poor. In February 1996 during a supervised visit, Sharonda became upset that the boys referred to their foster family as "mommy and daddy." She told them not to call her anything but "mommy" and told them that their fathers were in jail. The boys became upset because they thought their foster father was in jail. She also called Joshua "fathead"; the child has macrocephaly. Dr. Howard Weinick, a psychologist who evaluated the family, testified concerning the children's interaction with Sharonda. His impression was that she wanted the children to meet her needs, "to meet her unmet needs from her own youth."
Since June 1996, Sharonda has been working with DMR social worker Patricia Carter. Ms. Carter works with Sharonda to access benefits from food programs, housing services, brings her to medical appointments and the like. Sharonda hopes to get back in school, although she is not in school at present. Sharonda has recently secured an apartment in Waterbury with the help of Ms. Carter.
The court finds that Sharonda has not achieved the degree of personal rehabilitation as would encourage the belief that within a reasonable amount of time, considering the age and needs of the children, that she could assume a responsible position in the life of these children. Sharonda has many limitations as a parent, she is pregnant and will soon have to care for herself and a newborn child. Christopher and Joshua do not have a parent-child relationship with Sharonda. They have special needs medically and developmentally. The parent figures for these boys will require exceptional parenting skills. There is no reasonable prospect that Sharonda will achieve even average parenting ability given her lack of education, her poor parenting that she CT Page 8968 herself received, her lack of parenting skills and her other limitations.
ADJUDICATION
The court finds by clear and convincing evidence that Christopher and Joshua were previously found to be neglected in proceedings before the Superior Court for Juvenile Matters at Waterbury on November 12, 1993 (Barnett, J.). The court finds by clear and convincing evidence that Sharonda and the putative fathers Robert D., Robert S. and Deric H. have failed to rehabilitate themselves to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable amount of time considering the age and needs of the children that they could assume a responsible position in the life of these children.
The court further finds with respect to the fathers of these children that Christopher and Joshua have been abandoned by their fathers in the sense that the parents have failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the children. The court further finds that these grounds have existed for more than one year. With respect to the remaining allegations contained in the petition, the court dismisses them without prejudice.
DISPOSITION
It is not sufficient to find that grounds for termination exist. The court must also determine pursuant General Statute § 17a-112 (d) that if a termination of parental rights is in the best interest of the child, the court must make this finding by clear and convincing evidence. In Re Romance M.,30 Conn. App. 839, 846-47 (1993), appeal dismissed, 229 Conn. 345
(1994); see also Practice Book § 1050.1(3).
1. The Department of Children and Families has offered appropriate and timely services for visitation, for counseling and for support services including discussing job training and the possibility of returning to school. Parenting classes were offered three or four times. Parent aides who would go to the home to give instruction were offered. The parent aide was unable to find Sharonda because of her failure to maintain a residence or a good address. She was offered individual counseling and she went one time. As previously mentioned, Easter Seals programs and CT Page 8969 Family Ties services were also provided to Sharonda and her family. Visitation services were provided. DCF began offering services to Sharonda prior to her first child, while she lived with her mother before the children were removed, and after the children were removed. For the most part all attempts to assist Sharonda have been unsuccessful. In the very recent past Sharonda has been receiving DMR assistance and is attempting to keep her prenatal appointments, according to her testimony.
2. The court finds by clear and convincing evidence that the Department of Children and Families has made reasonable efforts given the situation and circumstances to reunite the children with the mother. The department has offered many forms of services as set forth above. The social workers have been tracking Sharonda and attempting to assist her by offering appropriate and timely services which would help Sharonda acquire parenting skills. Sharonda has not been emotionally and intellectually mature enough to benefit by the assistance offered to rehabilitate herself as a parent. She is just now availing herself of services that will benefit herself personally.
3. Regarding court orders for fulfilment of obligations, expectations and the like, the court finds that court-approved expectations were explained to Sharonda (Petitioner's Exhibit #2). Sharonda failed to comply with most expectations, especially her lack of consistent visitation so that she could have a meaningful relationship with the children. Her conduct with the children is child-like and inappropriate. Sharonda does not have the understanding, patience, judgement or maturity necessary to deal with two special-needs children.
4. The children's feelings and emotional ties with the biological parent and foster parents were fully considered by the court. The children are not bonded to either the natural mother or the maternal grandmother. According to the social worker, there appears to be a great bond between the children and their foster parents. Dr Weinick indicated that a close bond of trust and security had developed between the children and the foster parents. He was impressed with the foster father's attention to the children and his devotion to them.
5. With the respect to the age of the children, Christopher is five and Joshua is four and these children require stability in their life and a time to heal without the fear of greater uncertainty, and require an affirmation by this court that they CT Page 8970 will have a permanent home and stable environment.
6. With respect to the efforts the parents have made to adjust their circumstances, conditions and conduct to make it in the best interest of the children to be returned to their home in the foreseeable future. The court finds that the parents, notably the fathers, are of unknown circumstances and location. With respect to the mother, she is again pregnant, she is unemployed, she is just recently benefiting from DMR assistance, she has had three years to work to be reunited with these children and has not made any meaningful progress at establishing a relationship with these children or acquiring the skills necessary to parent them.
7. With respect to any barriers which may have been reasonably or unreasonably placed in the path of the parents to have a meaningful relationship with the children, the court finds that the Department of Children and Families has met its obligations to the mother by repeatedly offering a variety of services to her and assisting her with the attempts of visitation, counseling and the like. No barriers or impediments have been placed in Sharonda's path by any social services agency.
Having considered all the evidence, the court finds by clear and convincing evidence that it is in the children's best interest that a termination of their parents' rights be granted. In addition to the above considerations, the court is mindful of the overwhelming public policy in favor of requiring parents to financially support their children. In re Bruce R.,234 Conn. 194 (1995). There has been no showing in this case that the biological parents have the capacity to pay an adequate child support order or that the children's financial interests will be adversely effected by a termination of parental rights. The children's need for a secure, nurturing environment is paramount to any financial considerations in any event.
ORDER
The court, having considered all statutory considerations and having found by clear and convincing evidence that grounds exist for termination of parental rights, further finds upon all of the facts and circumstances presented, that it is in the child's best interest to terminate the parental rights of Sharonda, the biological mother, and Robert S., Deric H. and Robert D., the CT Page 8971 putative fathers of these children. Accordingly, it is ordered that their parental rights to Christopher and Joshua are hereby terminated.
It is further ordered that the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for the purpose of securing an adoptive family or other permanent placement for said children and that the Commissioner shall file with the court, no later than ninety (90) days following the date of judgement, a written report toward such permanent placements and file such further reports as are required by state and federal law.
FOLEY J.